UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Richard Igartua,<br><br>    Plaintiff<br><br>v.<br><br>Mid-Century Insurance Company, et al.,<br><br>    Defendant | 2:16-cv-00849-JAD-CWH<br><br>**Order on Summary Judgment**<br><br>[ECF Nos. 24, 38] |

    Richard Igartua alleges that in 2011 he was working as a tow-truck driver and injured his back when someone rear-ended his truck. He sues his employer's insurer, defendant Mid-Century Insurance Company, contending that its policy covers his injuries and that it acted in bad faith by refusing to pay him sooner. Igartua asserts claims for breach of contract, bad faith, and unfair claims practices.

    Mid-Century now moves for summary judgment on Igartua's bad faith and unfair practices claims, and I grant its motion. An insurer is liable for bad faith in Nevada only if the plaintiff can show that it both acted unreasonably and that it knew it was doing so. Similarly, an insurer must unreasonably handle a claim to be liable under Nevada's unfair practice statutes. But the undisputed evidence shows that Mid-Century reasonably handled Igartua's claims from the start. The insurer delayed paying Igartua, but only because there was a reasonable dispute about the extent of his injuries and whether they were even caused by the accident that Mid-Century's policy covered. Mid-Century regularly communicated with Igartua; it repeatedly requested documents so that it could evaluate his claim; and it paid for at least four experts to investigate his accident and whether he was entitled to coverage. Igartua thus has not created a triable issue as to his claims for bad faith or unfair practices.

# Background

In August 2011, Igartua alleges that he injured his back and neck in a car accident while on the job as a tow-truck driver. The insurer for the driver that hit Igartua paid him its policy limits of $25,000. Igartua then turned to his employer's insurer, Mid-Century, to cover the rest of the bills related to the accident.

Mid-Century responded to Igartua's claim within a day.[1] Over the next several months, Mid-Century communicated with Igartua and attempted to gather information related to his injuries and the accident.[2] In July of 2012, Igartua offered to settle with Mid-Century for about $50,000; Mid-Century countered for around $26,000, which Igartua rejected.[3]

Over the next several months, Mid-Century paid for multiple experts to review Igartua's medical records—including a radiologist, a nurse consultant, and multiple medical doctors.[4] These experts all concluded that many of the injuries that Igartua was seeking to recover for had nothing to do with the car accident; instead, they stemmed from his age, genetics, obesity, and other preexisting health problems.[5] For example, one medical doctor reviewed Igartua's x-rays and found that the injuries to his spine were consistent with "degenerative disc disease," not any traumatic injury relating to his accident.[6]

Mid-Century also hired an engineer expert to opine on whether the accident could have caused the injuries that Igartua was seeking compensation for. This engineer used various metrics, such as the physical dimensions of Igartua's truck and the velocity of the impact during the accident,

---

[1] ECF No. 35-4 (notes reflecting some of Mid-Century's communications).

[2] *See id.*

[3] *Id.*

[4] *See* ECF Nos. 24-11, 24-15, 24-21.

[5] *See* ECF Nos. 24-11, 24-15, 24-21.

[6] ECF Nos. 24-11 at 4; 24-15.

and determinated that the crash should not have caused any serious injury.[7] Mid-Century thus continued to doubt whether it was liable for Igartua's injuries.

In late 2013, Igartua demanded $500,000 to settle his case, and Mid-Century again rejected the offer. But Mid-Century continued to work on Igartua's claim, asking him for medical records and other documentation, including records for Igartua's past medical history so that Mid-Century could better determine which injuries were related to the crash.[8]

In early 2014, Mid-Century offered to pay Igartua $35,000 to settle his claim, but Iguarta refused. Later in 2014, Iguarta told Mid-Century that he was planning to have spinal surgery, which would up the damages that he allegedly suffered from the accident. Igartua made another demand to settle the case, and Mid-Century again asked for specific medical records so that it could consider his request.[9] Throughout 2015, Mid-Century received new medical records that had been missing.[10]

Igartua underwent his spinal surgery in late 2015. Shortly after, Igartua demanded the full limits of Mid-Century's policy—$1,000,000. Mid-Century again requested medical documentation from Igartua that he had not yet provided. Throughout the end of 2015 and up until Igartua filed this case in March of 2016, Mid-Century continued to ask Igartua for additional records and information about Igartua's medical history prior to his accident.[11]

These records eventually revealed that, despite Igartua claiming that he had no prior problems with his back—he had been treated for back pain several years before his accident.[12] Igartua's medical records from his treating physicians do not reveal that he ever disclosed his prior back

---

[7] ECF No. 24-21.

[8] *See* ECF No. 24-14 (supplement report).

[9] *See, e.g.,* ECF Nos. 24-7, 24-8.

[10] *See, e.g.,* ECF No. 24-16 (emergency room records from Igartua's 2008 accident).

[11] Even after this case was ongoing, Igartua continued to provide new information relevant to his injuries that may have impacted Mid-Century's evaluation of his claim. *See* ECF No. 39-1.

[12] ECF No. 24-16.

problems.[13]

**Discussion**

**A.    Summary-judgment standards**

The legal standard governing Mid-Century's motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[14] An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.[15] A fact is "material" if it could affect the outcome of the case.[16]

When considering a motion for summary judgment, I view all facts and draw all inferences in the light most favorable to the nonmoving party.[17] The purpose of summary judgment is "to isolate and dispose of factually unsupported claims"[18] and to determine whether a case "is so one-sided that one party must prevail as a matter of law."[19] It is not my role to weigh evidence or make credibility determinations.[20] If reasonable minds could differ on material facts, summary judgment is inappropriate.[21]

If the moving party shows that there is no genuine issue as to any material fact, the burden shifts to the nonmoving party, who must "set forth specific facts showing that there is a genuine

---

[13] ECF Nos. 24-16, 24-15.

[14] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing FED. R. CIV. P. 56(c)).

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[16] *Id.* at 248.

[17] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[18] *Celotex Corp.*, 477 U.S. at 323–24.

[19] *Anderson*, 477 U.S. at 252.

[20] *Id.* at 249, 255.

[21] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

issue for trial."[22] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; it "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in its favor.[23]

**B.   Mid-Century is entitled to summary judgment on Igartua's bad-faith claims.**

"Bad faith is established where the insurer acts unreasonably and with knowledge that there is no reasonable basis for its conduct."[24] It is not enough to show that, in hindsight, an insurer acted unreasonably; the plaintiff must show that the insurer knew or recklessly disregarded that it was acting unreasonably.[25] An insurer does not act in bad faith merely because it disagrees with the claimant's estimation of his injuries or delays paying out benefits until it receives relevant documents or expert opinions.[26] Generally, "a bad-faith claim is subject to summary judgment if the defendant demonstrates that there was a genuine dispute as to coverage, because if the insurer had a reasonable basis to deny coverage," the insurer is unlikely to know it was acting unreasonably.[27]

Where the undisputed evidence shows that the insurer had some reasonable basis for acting as it did, there is no bad faith. For example, courts have found that an insurer's significant delay in paying out benefits was not bad faith because the insurer had been waiting to collect documents to

---

[22] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 323.

[23] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

[24] *Guar. Nat. Ins. Co. v. Potter,* 912 P.2d 267, 272 (Nev. 1996).

[25] *Id.*; *see also Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998).

[26] *See Amini v. CSAA Gen. Ins. Co.*, 2016 WL 6573949, at *4 (D. Nev. Nov. 4, 2016) (granting summary judgment to insurer on bad-faith claim even though it delayed in making settlement offers and relied on only to expert opinions to reject the plaintiff's offer). *But see Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998) (finding a triable issue as to bad faith because there was "abundant evidence" that the insurer's "investigation was improper, incomplete, poorly done, [and] in violation of [its] own procedures").

[27] *Id.*

evaluate the claim.[28]  Similarly, an insurer's rejection of a claimant's demand was not bad faith where an independent medical review contradicted the claimant's estimation of his injuries.[29]  And finally, an insurer did not act in bad faith when it denied benefits based on evidence that the claimant's injuries stemmed from uncovered injuries that happened prior to a covered accident.[30]

Igartua alleges that Mid-Century acted in bad faith by refusing to pay him benefits sooner, by refusing to offer him more money, by relying on biased experts, and by generally being biased against him.  But Mid-Century has identified a reasonable basis for acting as it did, and Igartua has not offered any evidence from which a jury could find that Mid-Century knew it was acting unreasonably when handling his claim.

Igartua first suggests that Mid-Century unreasonably delayed payments, but Mid-Century had several reasons for taking as long as it did and rejecting Igartua's demands.  From the start, Mid-Century's experts all agreed that (1) Igartua's injuries stemmed from prior injuries unrelated to the accident that Mid-Century's policy covered and (2) his alleged damages were too high.  Mid-Century thus had a reasonable basis to request more documents and continue to evaluate Igartua's claim until it could determine whether his injuries were even covered by its policy.  The undisputed evidence shows that Mid-Century continued to ask for relevant documents right up until Igartua filed this suit.[31]  Indeed, just months before Igartua filed his complaint, Mid-Century notified him that it was missing documents that it needed to determine whether his injuries truly stemmed from the covered

---

[28] *Payaslyan v. Allstate Indem. Co.*, 610 F. App'x 659, 660 (9th Cir. 2015) (unpublished); *see also Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901 (1979) (holding that insurer was reasonable in withholding payment so that it could find out "on its own" that the requested amount of coverage was warranted).

[29] *Amini*, 2016 WL 6573949, at *4.

[30] *Williams v. Am. Family Mut. Ins. Co.*, 593 F. App'x 610, 612 (9th Cir. 2014) (unpublished).

[31] *See, e.g.,* ECF Nos. 35-5 at 6 (claim notes indicating that Mid-Century received a batch of documents in mid 2015); *id.* at 8–9 (claim notes from later in 2015 indicating that Mid-Century sent Igartua a letter informing him that documents are still missing); *id.* at 12 (claim notes indicating that Mid-Century received more documents at the end of 2015).

accident.[32] Mid-Century also had a reasonable basis to wait until it had information about his spinal surgery, which was done not longer before this case was filed. Igartua has thus not created a triable issue as to whether Mid-Century acted in bad faith by rejecting his offers and delaying payment.

The other evidence Igartua cites to does not raise a triable issue about bad faith, either. Igartua mostly relies on a handful of stray comments from Mid-Century's claims handlers to contend that Mid-Century was biased against him. He points to one of Mid-Century's employees noting that Igartua's injuries appeared to be "soft tissue," but given the minor nature of his accident, that was not an unreasonable belief at the time the statement was made. Igartua cites comments that Mid-Century made about investigating whether worker's compensation might cover Igartua's injuries, but there is nothing improper about Mid-Century attempting to figure out whether its coverage might be offset by other payments. Igartua also points to comments a Mid-Century claims handler made, such as that she thought Igartua's treating physician had a criminal record and worked in a "grungy" facility. But even assuming that this claims handler was skeptical of Igartua's physician, there is no evidence that she knew her beliefs were unreasonable.[33]

Igartua finally asserts that Mid-Century unreasonably handled his claim by relying on controversial experts and ignoring the findings of Igartua's treating physicians. But he offers no evidence that Mid-Century knew that the experts it hired were biased, and he offers no evidence that Mid-Century failed to consider his treating physicians' findings.[34] Although Igartua's physicians might have raised a dispute about the extent of his injuries and whether those injuries were covered

---

[32] ECF Nos. 35-5 at 14; *see also* ECF No. 1-2 at 14 (letter from Mid-Century to Igartua, dated February 10, 2016, noting that Mid-Century was still waiting on missing documents).

[33] Notably, the arguments Igartua levies against Mid-Century's experts are nearly identical to the comments that Mid-Century made about Igartua's treating physician. For example, Igartua accuses one of Mid-Century's expert of being a "notorious" "defense" expert who is "controversial" and "biased." ECF No. 35 at 24.

[34] Igartua argues that Mid-Century's experts were biased mainly by pointing to the fact that one of them was recently called out for being biased in another case. But there is no evidence that Mid-Century knew this when relying on his opinions, so it could not have been knowingly or recklessly acting unreasonably. And even if it did know this one expert was problematic, Mid-Century also relied on other experts to reject Igartua's offers.

by Mid-Century's policy, a reasonable dispute about coverage does not give rise to a bad-faith claim against an insurer.

**C.  Mid-Century is entitled to summary judgment on Igartua's unfair practices claim.**

Nevada statutes prohibit insurance companies from engaging in unfair practices when handling insurance claims.[35] Mid-Century argues that there is no evidence from which a reasonable jury could conclude that it unreasonably handled Igartua's claim. Igartua offers no opposition on this point, save incorporating the same arguments he made to support his bad-faith claim.

Those arguments fail here for the same reasons. Igartua has not offered evidence from which a reasonable jury could conclude that Mid-Century unreasonably delayed or otherwise unreasonably handled his claim. Although it delayed offering payments to Igartua, it had good-faith reasons for doing so.[36] It was still waiting for relevant documents nearly until this suit was filed.[37] Its experts provided detailed findings suggesting that Igartua's injuries were not even covered by Mid-Century's policy. And the undisputed evidence shows that Mid-Century responded to Igartua's communications and otherwise reasonably handled his claim.[38] I thus grant summary judgment in favor of Mid-Century on this claim as well.[39]

---

[35] Nev. Rev. Stat. § 686A.310.

[36] *Zurich Am. Ins. Co. v. Coeur Rochester, Inc.*, 720 F. Supp. 2d 1223, 1238 (D. Nev. 2010) (finding several-month delay did not state a claim under Nevada's unfair claims practices statutes).

[37] *See Williams v. Am. Family Mut. Ins. Co.*, 593 F. App'x 610, 612 (9th Cir. 2014) (affirming summary judgment for insurer on unfair claims practices claim because the insurer's delay was mostly attributable to it not having recieved documents it had requested).

[38] Igartua's unfair-practices claim would also fail because there is no evidence that Mid-Century's alleged mishandling caused him any damage. *Amini*, 2016 WL 6573949, at *4.

[39] Igartua also moves to file supplemental testimony from his treating physician. Igartua says that he was unable to offer this evidence with his opposition because the physician was unavailable. ECF No. 38. I find that Igartua has not shown good cause for his failure to provide this evidence earlier. But in any event, he could not rely on this evidence because he did not provide it during discovery; indeed, he did not even disclose this physician as an expert. Even if I did consider this doctor's testimony, it would not preclude summary judgment. The physician merely disputes whether some comments that Mid-Century's employees made about him and his surgical facility are true. Taking this testimony at face value, it still would not suggest that Mid-Century knew that it did anything that

**Conclusion**

Accordingly, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the defendant's **motion for partial summary judgment [ECF No. 24] is GRANTED.** I grant summary judgment in favor of the defendant and against plaintiff Igartua on his second and third claims for relief, leaving only his breach-of-contract claim for trial.

IT IS FURTHER ORDERED that the plaintiff's **motion for leave to file supplementary evidence [ECF No. 38] is DENIED.**

IT IS FURTHER ORDERED that this case is referred to the magistrate judge to schedule a mandatory settlement conference.

Dated this 28th day of June, 2017.

_____
Jennifer A. Dorsey
United States District Judge

---

was unreasonable in handling Igartua's claim.